DEPARTMENT OF ENVIRONMENTAL QUALITY v WATEROUS CO

Docket No. 272968. Submitted March 11, 2008, at Lansing. Decided April
15, 2008. Approved for publication June 24, 2008, at 9:00 a.m.

The Department of Environmental Quality (DEQ) brought an action
in the Ingham Circuit Court against Waterous Co., as corporate
successor to Traverse City Iron Works (TCIW), for alleged soil,
groundwater, surface water, and sediment pollution caused by
TCIW at its former foundry and manufacturing operation adjacent
to the Boardman River in Traverse City. The DEQ sought mon-
etary, declaratory, and injunctive relief, including investigation
and remediation of the contamination under parts of the Natural
Resources and Environmental Protection Act (NREPA), MCL
324.3101 *et seq.*, and MCL 324.20101 *et seq.*, and common-law
nuisance relief. The DEQ alleged that it had already expended
more than $1.6 million in public funds for response-activity costs.
The court, Joyce Draganchuk, J., denied Waterous's motions for
summary disposition and also denied a motion for reconsideration
of its denial. The court did determine that clarification of its
determinations regarding cleanup costs was appropriate and en-
tered an order stating that the court's opinion shall reflect that a
genuine issue of material fact remains regarding whether Water-
ous is liable for remediation costs under residential/commercial
criteria or an industrial criterion. The parties stipulated dismissal
of the claims asserting natural-resources damage, costs related to
natural-resources-damage assessment, and liability for injuries to
natural resources. The claims against Waterous for all response
activity costs, including attorney fees and interest, as sought in
paragraph C of the "relief requested" portion of the complaint,
were resolved before trial by stipulation and order, which required
Waterous to pay $1.25 million. Following a bench trial, the court
held that the site was a "facility" under the NREPA and that the
sand, slag, and core material on the site were a "hazardous
substance." The court concluded that there had been a direct
discharge of hazardous materials into the river, that such materi-
als are or may become injurious to the public health, safety, or
welfare, and that the conditions at the site constituted a public
nuisance. The court determined that Waterous, as TCIW's succes-
sor in interest, was responsible for the environmental liabilities by

operation of law. The court noted that the due-care obligations of the present owner and developer of the site did not extinguish any of Waterous's liability and that, with respect to the governing remediation criteria, the remedial action should be consistent with the current zoning of the site rather than the zoning at the time of TCIW's discharge of hazardous materials. The court also held that it was the responsibility of Waterous to investigate and remediate with regard to the extent of any groundwater contamination. The court also entered a permanent, mandatory injunction ordering Waterous to perform the required response activities. Waterous moved to amend or clarify the judgment and for reconsideration, and the court denied the motion. Waterous appealed.

The Court of Appeals *held*:

1. The trial court properly determined that the proper cleanup criteria should be consistent with the current zoning and use of the property at the time of remedial action.

2. The parties' stipulation only operated to dismiss the DEQ's claims for natural-resources damage and left for the trial court the determination of the issues concerning injunctive and declaratory relief.

3. The trial court properly ordered Waterous to perform the required response activities of investigating and remedying all the possible hazardous-substances contamination in the soils, groundwater, and river sediments of the facility even though only certain substances had been alleged to exceed the applicable criteria and evidence was only introduced concerning those substances.

4. The trial court did not err in finding that Waterous was the liable party under the NREPA and that Waterous therefore was obligated to perform the requisite remediation at the site. Waterous, as the prima facie liable party, bore the burden of showing that it was not actually liable for the contamination at issue. Failing to make that showing renders a liable party jointly and severally liable. If Waterous believes that other potential contributors are responsible, its proper remedy is to seek redress under MCL 324.20129.

5. The trial court properly determined that, pursuant to the merger agreement between TCIW and Waterous, which specifically incorporated the terms of the Business Corporation Act, MCL 450.1101 *et seq.*, Waterous, as TCIW's successor in interest, stood in TCIW's shoes for the purposes of liability.

6. The trial court did not abuse its discretion in admitting the testimony of the DEQ's expert witness and the evidence on which the witness based his testimony.

7. Where a nuisance is temporary, that is, one that is abatable by reasonable curative or remedial action, damage to property affected by the nuisance is recurrent, and monetary damages may be recovered from time to time until the nuisance is abated. The claims here involve a temporary nuisance. The trial court did not err in holding that, because the nuisance was continuing, the claim was not barred by the statute of limitations.

8. A DEQ administrative rule, Mich Admin Code, R 299.5115, provides that the DEQ has no obligation to notify a party until the DEQ determines that an identifiable party is liable. The DEQ had no duty to notify Waterous when Waterous was only a potentially liable party.

9. There is no merit to Waterous's spoliation-of-evidence claim.

Affirmed.

1. ENVIRONMENT — ENVIRONMENTAL CONTAMINATION — REMEDIAL ACTION PLANS — CLEANUP CRITERIA.

The Natural Resources and Environmental Protection Act provides that the proper environmental-cleanup criteria applicable to a remedial-action plan for property should be consistent with the current zoning and use of the property at the time of the remedial action (MCL 324.20120a[6]).

2. ENVIRONMENT — ENVIRONMENTAL CONTAMINATION — RESPONSE ACTIVITY.

A party who is liable for the performance of response activity under the Natural Resources and Environmental Protection Act has the responsibility to perform all necessary response activities, including investigating and evaluating the full nature and extent of contamination at the subject facility (MCL 324.20101[1][m] and [ee]; MCL 324.20118[1]).

3. ENVIRONMENT — ENVIRONMENTAL CONTAMINATION — LIABILITY.

A party who is the prima facie liable party for environmental contamination bears the burden of showing that it is not actually liable for the contamination; failing to make that showing renders the liable party jointly and severally liable; however, if the liable party believes that other contributors are responsible, its proper remedy is to seek relief under MCL 324.20129 (MCL 324.20126[6]; MCL 324.20126a[1]; MCL 324.20129[3]).

4. NUISANCE — TEMPORARY NUISANCES — DAMAGES.

Damage to property affected by a temporary nuisance, that is, one that is abatable by reasonable curative or remedial action, is

> recurrent, and monetary damages may be recovered from time to time until the nuisance is abated.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *Robert P. Reichel*, Assistant Attorney General, for the plaintiff.

*Varnum, Riddering, Schmidt & Howlett LLP* (by *Charles M. Denton* and *Joshua M. Wallish*) and *Burr & Forman LLP* (by *J. Ross Forman, III*), for the defendant.

Before: WHITBECK, P.J., and JANSEN and DAVIS, JJ.

PER CURIAM. Defendant Waterous Co. (Waterous) appeals as of right the judgment in favor of plaintiff Michigan Department of Environmental Quality (DEQ) entered after a bench trial. This case arises out of the DEQ's claim for damages and injunctive relief against Waterous for alleged contamination of certain property and the adjoining Boardman River. We affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

#### A. FACTS

This case stems from the use of certain property located adjacent to the Boardman River in Traverse City, Michigan. Traverse City Iron Works (TCIW) used the property at issue (the Site) for a foundry operation from the early 1900s until 1974, when TCIW moved its foundry operation. While TCIW was using the Site as a foundry, sand used as molds for the molten iron (core/mold sand) and slag were discarded on the Site, along the bank of the Boardman River. Environmental studies later revealed that approximately 80,000 cubic yards of foundry waste were present on the Site, in some places in direct contact with the water table and the river sediments.

TCIW merged with Waterous in 1978, and the Site was conveyed to Waterous in July 1980. However, it is undisputed that Waterous never performed any industrial operations on the Site or made any changes or improvements to the Site.

Waterous then sold the Site to a developer, TCI Associates, in February 1982. At the request of Traverse City (the City), all existing structures were torn down. TCI Associates later combined the Site with other adjoining parcels for the purpose of redevelopment. However, TCI Associates never actually redeveloped the Site; instead, TCI Associates sold the Site and adjoining parcels to another developer, Northern Rock Holdings, L.L.C. (Northern Rock) (doing business as River's Edge Development), in February 1997.

In June 1997, the City sought a Site Reclamation Program Grant (SRP Grant)[1] from the DEQ to remediate the Site so that Northern Rock could redevelop it for commercial and residential use. The SRP Grant was approved in September 1997 in the amount of $1,582,975, and remediation and redevelopment work began shortly thereafter. Under the SRP Grant, the DEQ paid the City for certain costs, including installing a retaining wall along the bank of the adjoining Boardman River and backfilling behind the wall.

In December 2002, the DEQ formally notified Waterous that it was liable for contamination at the Site and responsible for the release of hazardous substances that exceeded the residential cleanup requirements of the National Resources and Environmental Protection Act (NREPA).[2] The DEQ noted that, in accordance with state law, it had already spent state funds to perform

---

[1] MCL 324.19506 *et seq.*

[2] See MCL 324.20120a(1)(a) and (17).

response activities at the Site. The DEQ demanded that Waterous undertake necessary response activities, as well as provide reimbursement for past and future response activities by the state.

## B. THE COMPLAINT

In October 2003, the DEQ filed this lawsuit against Waterous, as corporate successor to TCIW, for alleged soil, groundwater, surface water, and sediment pollution caused by TCIW at its former foundry and manufacturing operation adjacent to the Boardman River in Traverse City. The DEQ sought monetary, declaratory, and injunctive relief, including investigation and remediation of the contamination under the NREPA,[3] and common-law public nuisance relief. The DEQ alleged in its complaint that the state had expended more than $1.6 million in public funds for response-activity costs.

## C. WATEROUS'S PRETRIAL MOTIONS

In February 2004, Waterous filed a Notice of Fault of Non-Parties, identifying numerous other parties who were or may be wholly or partially at fault for the damage alleged in the DEQ's complaint. Waterous claimed that each of the named parties was located in Grand Traverse County and had emitted contaminants into the environment, in varying amounts and over various periods, in proximity to the Site. In December 2004, Waterous filed a supplemental Notice of Fault of Non-Parties.

In February 2005, Waterous filed three motions for summary disposition. In its first motion, Waterous

---

[3] MCL 324.3101 *et seq.* and MCL 324.20101 *et seq.* (parts 31 and 201 of the NREPA).

sought dismissal of the DEQ's NREPA claims, arguing that the DEQ had failed to meet its burden of proof to show that TCIW's foundry operations caused contamination of the Boardman River. Waterous pointed out that its environmental expert stated that any contamination of the Boardman River "did not originate from the TCIW Site, but likely originated from other properties around the lake." Waterous also pointed out that DEQ project manager John Vanderhoof conceded that there were multiple potential contributors to the Boardman River sediment contamination. The DEQ responded to this motion, arguing that undisputed deposition testimony established that TCIW systematically dumped foundry waste along and into the river; thus, there was at least a genuine issue of material fact regarding the extent of the contamination that TCIW caused. The DEQ pointed out that the fact that other parties might be liable was not a defense to Waterous's joint and several liability.

In its second motion, Waterous argued, in pertinent part, that the three-year period of limitations set forth in MCL 600.5805(10) time-barred the DEQ's nuisance claim. Waterous noted that, according to the complaint, operations at the property ceased in 1981. The DEQ responded to this motion, arguing that MCL 600.5805(10), which applies to *recovery of damages* for injury to a person or property, did not apply under the circumstances. The DEQ asserted that because it was seeking *injunctive relief* to abate a public nuisance, the six-year period of limitations set forth in MCL 600.5813 was the applicable period governing its claim. The DEQ further asserted that because the nuisance was continuing, the period of limitations was tolled.

In its third motion, Waterous argued that many of the costs for which the DEQ sought reimbursement

were not environmental-cleanup costs necessary under part 201 of the NREPA, but were instead costs incurred as a result of residential redevelopment of the Site. Waterous argued that the costs for which the state could be reimbursed did not include costs incurred to clean up a site according to more stringent criteria than those that are consistent with the Site's historical industrial use.[4] Waterous also argued that at the time the SRP Grant was filed in June 1997, the DEQ knew about Waterous's prior ownership of the land, yet it failed to notify Waterous of the claimed contamination at the site until December 2002, in violation of DEQ Administrative Rule 299.5115, Mich Admin Code, R 299.5115.[5] Waterous further pointed out that John Vanderhoof's testimony indicated that the failure to notify Waterous was intentional and politically motivated. Therefore, Waterous argued that the DEQ did not want Waterous coming in and performing work and testing that might slow down the redevelopment and the achievement of goodwill that the DEQ hoped would be generated with the completion of the project. Waterous further noted that many of the costs sought to be reimbursed were actually for development and construction rather than environmental cleanup. Finally, Waterous argued that included in the costs

---

[4] See *Detroit v Simon*, 247 F3d 619 (CA 6, 2001).

[5] Mich Admin Code, R 299.5115 provides, in pertinent part:

(1) Except as provided in subrule (3) of this rule, before beginning response activity at a facility with public funds, the department shall provide notice to persons who are liable who have been identified, as described in this rule.

* * *

(3) The requirements of this rule shall not apply when the department has not determined that a person is liable or when the notice process would unreasonably delay the response.

sought to be reimbursed were costs associated with the developer's part 201, § 20107a "Due Care" obligations.[6]

The DEQ responded to this motion, arguing that it had no obligation to notify Waterous of its liability until the DEQ actually made a determination that Waterous was liable. The DEQ further argued that, even assuming that it had failed to properly notify Waterous, such noncompliance was no defense to Waterous's liability. The DEQ argued that all the assessed costs were for response activities under part 201. The DEQ also argued that it was entitled to reimbursement under the commercial/residential criteria because that was how the land was zoned in 1997 when state-funded response activities commenced. Lastly, the DEQ argued that under the NREPA, Waterous was jointly and severally liable for the costs incurred.

After hearing oral arguments on Waterous's motions for summary disposition, the trial court denied all three motions, ruling that the nuisance alleged was a continuing wrong and, therefore, not barred by the statute of limitations. The trial court further concluded that there were material factual disputes on the issue of sediment contamination and agreed with the DEQ that the fact that there may have been other contributors to the contamination did not relieve Waterous of its liability. Turning to the notification issue, the trial court concluded that the DEQ was not required to notify a party until it determined that the party was liable. The trial court reasoned that even if the chain of title did mention Waterous, such mention did not necessarily equate with liability. The trial court further found that there were questions of fact regarding whether the

---

[6] MCL 324.20107a.

costs that the DEQ sought to have reimbursed were actually associated with environmental-cleanup costs or were for construction purposes. Turning to the criteria used to assess the costs, the trial court noted that the historical use of the Site was not purely industrial; the trial court explained, "Where the industrial use ceased in 1981, the site was not used until 1997 when it was developed for a mixed residential and commercial use, and I cannot find that the wrong historical use criteria are being used here."

Waterous moved for reconsideration of the trial court's denial of its motions for summary disposition. With respect to the nuisance claim, Waterous first conceded that the proper period of limitations was the six-year period of limitations set forth in MCL 600.5813. However, Waterous argued that the trial court erroneously relied on *Bielat v South Macomb Disposal Auth*[7] in determining that the alleged contamination constituted a continuing nuisance because that case was not only unpublished, but also materially distinguishable. In that case, and the cases relied on therein, the tortious acts were ongoing, as opposed to merely the harmful effects of completed conduct. Waterous pointed out that it was undisputed that the operations on the Site here ceased by 1981; therefore, the wrong was not continuing, and the period of limitations expired in 1987. Waterous further argued that, even assuming that the nuisance was continuing, the DEQ's claim was limited to those events that occurred within six years of when the suit was filed. With respect to the notice issue, Waterous argued that the trial court ignored evidence supporting a finding that the DEQ

---

[7] *Bielat v South Macomb Disposal Auth*, unpublished opinion per curiam of the Court of Appeals, issued November 9, 2004 (Docket No. 249147).

knew of Waterous's potential liability as early as 1980. Waterous further sought clarification of the trial court's decision regarding the historical use of the Site. Waterous conceded that in 1981 a small portion of the Site was rezoned residential, but Waterous contended that the appropriate focus should be on the prior use, not just zoning.

On April 12, 2005, the trial court entered an order stating that reconsideration of its denial of the motions for summary disposition was not warranted. The trial court concluded, however, that clarification on the cleanup-costs issue was appropriate. Therefore, the trial court granted Waterous's motion to clarify and ordered that "[t]he Court's opinion shall hereby reflect that a genuine issue of material fact remains on whether [Waterous] is liable for remediation costs under the residential/commercial criteria or the industrial criterion."

### D. PRETRIAL STIPULATIONS

On March 11, 2005, the parties stipulated the dismissal of the DEQ's natural resources claims. The stipulated order provided, *in toto*:

> The parties, by their individual counsel, hereby stipulate, pursuant to MCR 2.504(A)(1)(b), that the portion of [the DEQ]'s Complaint asserting State claims for natural resources damages, natural resources damages assessment costs, and liability for injuries to natural resources, which were or could have been asserted herein be dismissed with prejudice, and without costs.

Further, the DEQ's claims against Waterous for "all response activity costs, including attorneys' fees and interest, as sought in Paragraph C of the Relief Requested portion of [the DEQ]'s complaint" were later

resolved before trial by stipulation and order, which required Waterous to pay $1.25 million.

### E. THE TRIAL COURT'S FINDINGS AND CONCLUSIONS

After a two-week trial, the distinguished trial court issued a well-reasoned and comprehensive 31-page opinion detailing its findings of fact and conclusions of law in July 2006.

According to the trial court,

[a]t the time of trial, the issues to be decided were whether a declaratory judgment should issue finding [Waterous] liable for future response activity costs under Parts 31 and 201 of NREPA, whether [the DEQ] should receive injunctive relief and whether [Waterous] is responsible for abatement of a public nuisance.

With respect to part 201 of the NREPA, the trial court concluded that the Site was a "facility," which MCL 324.20101(1)(o) defines as "any area, place, or property where a hazardous substance in excess of the concentrations which satisfy the requirements of [MCL 324.20120a(1)(a) or (17)] or the cleanup criteria for unrestricted residential use under part 213 has been released, deposited, disposed of, or otherwise comes to be located." The trial court based this conclusion on testimony from former TCIW employees, who testified about the dumping of sand, slag, and core material, and the testimony of Roger Mawby, a geotechnical engineer, who testified that soil and groundwater samples taken from the Site exceeded the "generic residential clean-up criteria." The trial court also concluded that the sand, slag, and core material were a "hazardous substance," which MCL 324.20101(1)(t)(*i*) defines as "[a]ny substance that the department demonstrates, on a case by case basis, poses an unacceptable risk to the public health, safety, or welfare, or the environment, consid-

ering the fate of the material, dose-response, toxicity, or adverse impact on natural resources." The trial court based this conclusion on soil-sampling data collected in 1998 that demonstrated that the soil on the Site "contained arsenic, cadmium, copper, lead and zinc at levels above the generic residential criteria." The trial court noted that Vanderhoof had opined that there was contamination in the soil and groundwater at the Site that posed a risk of harm to either human health or the environment.

Turning to part 31 of the NREPA, the trial court concluded that the DEQ had proven by a preponderance of the evidence that there was direct and indirect discharge of the sand, slag, and core material into the Boardman River.[8] Further, having already concluded that the materials were hazardous, the trial court concluded that it was proved that the materials are or may become injurious to the public health, safety, or welfare. The trial court then went on to conclude that the conditions at the Site constituted a public nuisance, noting that "[i]t is difficult to imagine a right more common to the public than the right to a safe and healthy environment."

The trial court further concluded that, even though Waterous never owned the Site while any release of contamination took place, Waterous was indeed liable for the discharge because, as TCIW's successor in interest, Waterous stood in TCIW's shoes for the purposes of liability. The trial court based this decision on the merger agreement between TCIW and Waterous and the Michigan Business Corporation Act,[9] which both stated that a surviving corporation, like Waterous, assumed all the liabilities of the other corporate parties

[8] See MCL 324.3109.

[9] MCL 450.1724(1).

to the merger. The trial court acknowledged that article 4.1(g) of the Waterous/TCIW Plan of Reorganization and Agreement of Merger indicated that Waterous was not intended to be liable for any obligations not stated in TCIW's balance sheets at the time of merger, but nevertheless concluded that Waterous was responsible for the environmental liabilities by operation of law. The trial court found it significant that Waterous failed to comply with MCL 324.20126(1)(c), which allows certain innocent purchasers to avoid liability. The trial court refused to allow Waterous to create its own innocent-purchaser exception not provided by statute.

Turning to the remediation efforts, the trial court concluded that the developer's due-care obligations did not extinguish any liability of Waterous. The trial court further noted that the effect of the developer's activities on the land, for example, the exacerbation of the contamination, was not at issue in this case. Nevertheless, the trial court explained that any such exacerbation was not an intervening cause to extinguish Waterous's liability. With respect to the governing remediation criteria, the trial court concluded, on the basis of the language of part 201 of the NREPA, that remedial action should be consistent with current zoning, not historical use of the property: "The property is now zoned as a Developmental District and a mixed residential/commercial use is allowed. Thus, the use of the property necessitates any future clean-up be conducted to meet residential zoning requirements."

The trial court concluded that the testimony revealed that the extent of any groundwater contamination had yet to be determined; thus, further potential remedial action was necessary. The trial court further concluded that although other businesses may have contributed to sediment contamination, this possibility did not negate

a conclusion that dumping at the Site into the Boardman River has had and may continue to have an impact on aquatic life: "As in the case of the soil and the groundwater, the full extent of the contamination and its impact are unknown. It is by law [Waterous's] responsibility to investigate and remediate."

In sum, the trial court held that the DEQ had proved by a preponderance of the evidence that it was entitled to declaratory and injunctive relief. The trial court simultaneously entered judgment in favor of the DEQ, declaring Waterous to be liable under MCL 324.20126(1)(b) and MCL 324.20126a(1)(a) "for all future costs of response activity costs lawfully incurred by the State relating to the selection and implementation of response activity at [the Site]." The trial court also entered a permanent, mandatory injunction enjoining Waterous to "perform all response activity necessary to protect the public health, safety, welfare, and the environment and achieve and maintain compliance with part 201 [of] the [NREPA] . . . with respect to all releases of hazardous substances at and emanating from [the Site]." More specifically, the trial court's judgment required Waterous to do the following:

1. Within one hundred twenty (120) days after entry of [the] Judgment, . . . submit to the MDEQ for review and approval a work plan for remedial investigation that:

(a) complies with the requirements of [Mich Admin Code] R 299.5528;

(b) is sufficient to fully determine the nature and extent of contamination of hazardous substances at and emanating from the [Site] in all impacted environmental media, including soils, groundwaters, and sediments, and to support the selection of a remedial action for the facility that complies with Part 201 and its rules; and

(c) contains a reasonable schedule for implementation of the work plan and completion of a remedial investigation report.

2. Implement the remedial investigation work plan as approved by the MDEQ in accordance with the approved schedule.

3. If the remedial investigation report identifies more than one (1) feasible remedial option for remedial action at the facility, Waterous shall, within ninety (90) days after completion of the remedial investigation report submit to the MDEQ for review and approval, a feasibility study for the facility that:

(a) complies with Part 201 and its rules, including [Mich Admin Code] R 299.5530; and

(b) is sufficient to support the selection of a remedial action for the facility that complies with Part 201 and its rules.

4. Within ninety (90) days after the completion of the remedial investigation report or the feasibility study, whichever is later, submit to the MDEQ for review and approval, a remedial action plan or remedial action closure report that:

(a) complies with, and contains all elements required under, Part 201 and its rules, including, without limitation, MCL 324.20118, MCL 324.20120a, MCL 324.20120b, and [Mich Admin Code] R 299.5530;

(b) is sufficient to support, to achieve, and to maintain compliance with Part 201 and its rules, and assure protection of the public health, safety, welfare, and the environment, and

(c) contains a reasonable schedule for implementation.

5. Implement the remedial action or closure plan as approved by the MDEQ according to the approved schedule.

6. Maintain long-term compliance with all elements of the approved remedial action or closure plan, including, without limitation, land-use or resource-use restrictions, monitoring, operation and maintenance, permanent markers, and financial assurance.

7. Implement any other response activity needed to assure protection of public health, safety, welfare and the environment and to achieve and maintain compliance with Part 201 and its rules.

F. WATEROUS'S POSTTRIAL MOTION

Waterous moved to amend or clarify the judgment and for reconsideration. Waterous pointed out that the judgment required investigation and possible remediation of Boardman River sediments, even though there was undisputed testimony that the sediments did not pose any threat to human health, safety, or welfare. According to Waterous, the only alleged threat from the sediment was to the benthic organisms (aquatic insects) that lived in the sediment, and any claim for harm to such organisms, as natural resources of the state, was dismissed by stipulated order before trial. The DEQ responded, arguing that it agreed to dismiss its claim for natural-resources *damage* only, not its claims for injunctive relief with respect to such natural resources.

Waterous also pointed out that in the judgment's Findings of Facts and Conclusions of Law, the trial court noted that only "concentrations of arsenic, copper, chromium and lead . . . represented a reasonable potential for impact to aquatic life." Yet the judgment did not limit the sediment investigation to those specific contaminants. Therefore, Waterous argued that the judgment should be modified to limit its sediment-investigation responsibilities to those contaminants. Similarly, Waterous pointed out that the DEQ's notice letter noted only certain limited contaminants in the groundwater and the soil as posing an environmental threat. Yet, again, the judgment did not limit the groundwater and soil investigations to those specific contaminants. Therefore, Waterous argued that the judgment should be modified to limit its groundwater-

and soil-investigation responsibilities to those contaminants. The DEQ responded, arguing that the full extent of the contamination at the Site had yet to be determined, which was the point of requiring Waterous to perform a full investigation.

With respect to Waterous's natural-resources argument, the trial court noted that Waterous failed to object to the DEQ's presentation at trial of evidence regarding sediment contamination; indeed, the trial court noted, Waterous countered that evidence with its own, attempting to show a lack of sediment contamination. The trial court stated that all this evidence was relevant to the DEQ's claim for injunctive relief, as opposed to damages. Therefore, the trial court concluded that "[t]he request for injunctive relief is a request that this Court granted, and it's distinct from and not barred by dismissal of the natural resources damage claim." Turning to Waterous's arguments regarding the scope of its investigation responsibilities, the trial court concluded as follows:

> [Waterous's] second claim is that any work [Waterous] is required to do with respect to sediments and groundwater should be limited to those contaminants found to be of concern. The contaminants that were of concern were relevant to showing that this site was a facility and there was a need for injunctive relief. The very point of the [DEQ's] case and the focus of this Court's findings of fact and conclusions of law were that the conditions are not entirely known at this site and the scope is not entirely known. Having shown that, that the site is a facility and there is a need for injunctive relief, there is nothing in Part 201 or rules that are promulgated thereunder that would limit the injunctive relief to only those contaminants that were used by [the DEQ] to show that this was a facility and that there is a need for injunctive relief.
>
> The remainder of this argument, I would consider, as far as it goes to groundwater and the argument made with

respect to soils, I would consider to be just a rehashing of issues that have been fully and completely litigated and fully and carefully considered by this Court.

Accordingly, the trial court denied Waterous's motion to clarify and for reconsideration. Waterous now appeals.

## II. THE TRIAL COURT'S FINDINGS

### A. STANDARD OF REVIEW

This Court may only set aside a trial court's findings of fact if those findings are clearly erroneous.[10] This Court reviews de novo a trial court's conclusions of law.[11] And this Court reviews for an abuse of discretion a trial court's ruling on a motion for relief from judgment.[12]

### B. REMEDIATION CRITERIA: RESIDENTIAL VERSUS INDUSTRIAL

In its findings and conclusions, the trial court concluded, on the basis of the language of part 201 of the NREPA, that remedial action should be consistent with the current zoning and not the historical use of the property. The trial court then found as follows:

The zoning of the parcels changed over the years, most recently to accommodate redevelopment. In 1958, some of the parcels were zoned M-1 for restricted industrial use and some were zoned C-3 for commercial use. In 1997, the site was designated as a Planned Unit Development ("PUD"), allowing for mixed residential and commercial use. The zoning of the PUD was ultimately changed to D-1,

---

[10] MCR 2.613(C).

[11] *Glen Lake-Crystal River Watershed Riparians v Glen Lake Ass'n*, 264 Mich App 523, 531; 695 NW2d 508 (2004).

[12] *Jackson Printing Co, Inc v Mitan*, 169 Mich App 334, 340; 425 NW2d 791 (1988).

Development District. By the time of trial, the redevelopment had resulted in an attractive landscape of condominiums, a boardwalk along the riverbank, and a variety of retail and commercial buildings.

Therefore, the trial court concluded that the "property is now zoned as a Development District and a mixed residential/commercial use is allowed. Thus, the use of the property necessitates any future clean-up be conducted to meet residential zoning requirements."

Part 201 of the NREPA provides for different levels of cleanup criteria depending on the category of land use. Specifically, MCL 324.20120a states, in pertinent part:

> (1) The department may establish cleanup criteria and approve of remedial actions in the categories listed in this subsection. The cleanup category proposed shall be the option of the person proposing the remedial action, subject to department approval, considering the appropriateness of the categorical criteria to the facility. The categories are as follows:
>
> (a) Residential.
>
> (b) Commercial.
>
> * * *
>
> (d) Industrial.
>
> (e) Other land use based categories established by the department.

Waterous argues that the trial court erred in holding Waterous liable for cleanup of the Site to residential, rather than industrial, criteria because caselaw holds that a responsible party only has liability for cleanup that meets the criteria representative of that party's historical use of the site and that cleanup to a higher standard is the responsibility of the party that wishes to

put the land to that different use. Specifically, Waterous relies on *Detroit v Simon*,[13] and *Regional Airport Auth v LFG, LLC*.[14] However, rather than following Waterous's interpretation of these factually distinguishable[15] and nonbinding federal cases,[16] we instead follow the binding authority of the NREPA, which specifically addresses cleanup criteria with respect to zoning of property:

> The department shall not approve of a remedial action plan in categories set forth in subsection (1)(b) to (j), *unless the person proposing the plan documents that the current zoning of the property is consistent with the categorical criteria being proposed,* or that the governing zoning authority intends to change the zoning designation so that the proposed criteria are consistent with the new zoning designation, or the current property use is a legal nonconforming use. The department shall not grant final approval for a remedial action plan that relies on a change in zoning designation until a final determination of that zoning change has been made by the local unit of government. The department may approve of a remedial action that achieves categorical criteria that is based on greater exposure potential than the criteria applicable to current zoning. In addition, *the remedial action plan shall include documentation that the current property use is consistent with the current zoning* or is a legal nonconforming use. Abandoned

[13] *Simon*, n 4 *supra*.

[14] *Regional Airport Auth v LFG, LLC*, 460 F3d 697 (CA 6, 2006) (following *Simon*).

[15] As the trial court here recognized, the *Simon* court did not indicate on what basis the city of Detroit was requesting clean up beyond the industrial criteria and there was no indication that the property in that case had been rezoned.

[16] *American Axle & Mfg, Inc v Hamtramck*, 461 Mich 352, 364; 604 NW2d 330 (2000) (stating that although a Michigan court may choose to agree with the analysis of a federal court decision, "federal court decisions are not precedentially binding on questions of Michigan law").

or inactive property shall be considered on the basis of zoning classifications as described above.[17]

As the emphasized language makes clear, the proper cleanup criteria should be consistent with the current zoning and use of the property at the time of remedial action.

Indeed, contrary to Waterous's arguments, *Simon* actually supports a conclusion that the proper cleanup criteria should be consistent with the current use of the property. In *Simon,* the court recognized that "recovery of environmental cleanup costs incurred to achieve a higher level *than the use of the property necessitates* would violate CERCLA's [the Comprehensive Environmental Response Compensation and Liability Act] requirement that recoverable response costs be 'necessary.' "[18] Here, the current residential use of the property necessitates that the residential cleanup criteria be applied.

Accordingly, we conclude that the trial court properly applied the plain language of MCL 324.20120a of the NREPA to hold that any remedial action must be consistent with the Site's current residential use.

### C. NATURAL-RESOURCES DAMAGES

The issue here is the extent to which the parties' March 11, 2005, stipulation dismissed the DEQ's natural-resources claims,[19] that is, whether the stipulation dismissed all the DEQ's natural-resources

---

[17] MCL 324.20120a(6) (emphasis added).

[18] *Simon, supra* at 630 (citations omitted; emphasis added).

[19] Natural-resources claims are for injuries to the environment. Part 201 of the NREPA defines both "environment" and "natural resources" as "land, surface water, groundwater, subsurface, strata, air, fish, wildlife, or biota within the state." MCL 324.20101(1)(k).

claims, including those for injunctive and declaratory relief, or just those for damages. We conclude, contrary to Waterous's claim that the stipulation was intended to do the former, that the stipulation only operated to dismiss the DEQ's claims for *natural-resources* damages, thereby leaving for trial a determination on the issues concerning injunctive and declaratory relief.

In its March 4, 2005, brief in opposition to Waterous's motion for summary disposition on the limitations-period issues, the DEQ first noted that it would be voluntarily dismissing its "natural resources damage claims, with prejudice." In its brief in opposition to Waterous's motion for summary disposition on the issue of sediment contamination, again noting its intent to dismiss its claim for natural-resources damages, the DEQ explained that it was only seeking "to require Waterous to determine the full extent of the contamination caused by TCIW and then develop and implement an appropriate remedy for such contamination."

On March 11, 2005, the parties stipulated the dismissal of the DEQ's natural-resources claims as follows:

> The parties, by their individual counsel, hereby stipulate, pursuant to MCR 2.504(A)(1)(b), that the portion of [the DEQ]'s Complaint asserting State claims for natural resources damages, natural resources damages assessment costs, and liability for injuries to natural resources, which were or could have been asserted herein be dismissed with prejudice, and without costs.

During the hearing on Waterous's motions for summary disposition held that same day, counsel for Waterous specifically mentioned the stipulation, explaining as follows:

> [W]e have submitted to the Court a stipulation that partially addresses [Waterous]'s statute of limitations motion regarding natural resources damages. The [DEQ] has

agreed to dismiss their claims for natural resources damages with prejudice and we have submitted a stipulation for the Court's consideration today.

Shortly thereafter, counsel for Waterous stated:

> The relief we are requesting today on these motions is as follows: . . . natural resources damages has been dismissed by stipulation . . . .
>
> \*   \*   \*
>
> On sediments, we are asking to clarify our motion that states [sic] claim for future injunctive relief to address river sediments in the vicinity [of the] TCIW site be dismissed without prejudice.

These statements clearly indicate that at the time the stipulation was entered, both parties, but especially Waterous, understood that the stipulation was only intended to dismiss the DEQ's claims for *natural-resources* damages. And as the DEQ points out, a review of its requests for relief in its complaint also supports this conclusion.

The DEQ's complaint sought the following relief:

> A. Declare that Traverse City Iron Works' conduct, for which Waterous is responsible through merger, was unlawful and in violation of NREPA Part 31 and Part 201;
>
> B. Grant an injunction requiring Waterous to undertake the appropriate response activities under Part 31 and Part 201 and their administrative rules;
>
> C. Order Waterous to pay [the DEQ]'s response activity costs, including attorney fees, incurred at or in relation to the Facility, plus statutory prejudgment interest;
>
> D. Order Waterous to pay damages for the full value of injury to, destruction of, or loss of natural resources resulting from the release or threat of release, including the reasonable costs of assessing the injury, destruction, or loss resulting from the release or threat of release;

E. Order Waterous to abate the public nuisance, and;

F. Grant [the DEQ] further relief as the Court finds just and appropriate.

According to the DEQ, the stipulated order was only intended to dismiss the DEQ's claim asserted in paragraph D of its complaint. To support this point, the DEQ notes that each of its first four requests for relief correspond to the relief permitted by MCL 324.20137 of the NREPA. Paragraph A, which requests declaratory relief, corresponds to MCL 324.20137(1)(d), which allows for a cause of action seeking "[a] declaratory judgment on liability for future response costs and damages." Paragraph B, which requests injunctive relief, corresponds to MCL 324.20137(1)(a), which allows for a cause of action seeking "[t]emporary or permanent injunctive relief necessary to protect the public health, safety, or welfare, or the environment from the release or threat of release." Paragraph C, which requests recovery of response-activity costs, corresponds to MCL 324.20137(1)(b), which allows for a cause of action seeking "[r]ecovery of state response activity costs pursuant to section 20126a."[20] And, finally, paragraph D, which requests the payment of damages, corresponds to MCL 324.20137(1)(c), which allows for a cause of action seeking "[d]amages for the full value of injury to, destruction of, or loss of natural resources resulting from the release or threat of release, including the reasonable costs of assessing the injury, destruction, or loss resulting from the release or threat of release."

---

[20] As noted previously, the DEQ's claims against Waterous for "all response activity costs, including attorneys' fees and interest, as sought in Paragraph C of the Relief Requested portion of [the DEQ]'s complaint" were resolved before trial by stipulation and order, which required Waterous to pay $1.25 million.

We conclude that, when taken in the context of Waterous's admissions and the statutory framework, the stipulation operated only to dismiss the DEQ's claims for *natural-resources* damages, thereby leaving for trial a determination on the issues regarding injunctive and declaratory relief.

### D. EVIDENCE OF PARTICULAR HAZARDOUS SUBSTANCES

Waterous argues that the trial court erred in awarding injunctive relief concerning all possible hazardous substances when only certain substances were alleged to exceed applicable criteria and evidence was only introduced concerning those specific substances. We disagree.

In denying Waterous's motion to clarify or modify the judgment on this issue, the trial court reasoned that the point of the DEQ's bringing this cause of action was that the extent of potential contamination at the Site was not entirely known. Therefore, the trial court explained, requiring Waterous to perform a full investigation served the purpose of determining the full extent of the contamination at the Site. The trial court noted that the fact that certain contaminants had been identified merely served the purpose of showing that the Site was a facility under the NREPA and that there was a need for injunctive relief.

The trial court's conclusions were absolutely correct. The DEQ submitted, and the trial court relied on, evidence regarding the existence of certain proven contaminants simply to establish that response activities were necessary at the Site.[21] Determination of this threshold issue did not limit Waterous's ultimate liabil-

---

[21] See MCL 324.3109.

ity to fully investigate and remediate the Site in accordance with part 201 of the NREPA.

Under the NREPA, a liable party has the responsibility to perform all necessary response activities, which include investigating and evaluating the full nature and extent of contamination at the subject facility. Specifically, MCL 324.20118(1) authorizes the DEQ to

> take response activity or approve of response activity proposed by a person that is consistent with this part and the rules promulgated under this part relating to the selection and implementation of response activity that the department concludes is necessary and appropriate to protect the public health, safety, or welfare, or the environment.

And MCL 324.20101(1)(ee) defines "response activity" as

> evaluation, interim response activity, remedial action, demolition, or the taking of other actions necessary to protect the public health, safety, or welfare, or the environment or the natural resources. Response activity also includes health assessments or health effect studies carried out under the supervision, or with the approval of, the department of public health and enforcement actions related to any response activity.

"Evaluation" is defined as

> those activities including, but not limited to, *investigation,* studies, sampling, analysis, development of feasibility studies, and administrative efforts that are *needed to determine the nature, extent, and impact of a release or threat of release* and necessary response activities.[22]

Here, there has been no remedial investigation to determine the full nature and extent of contamination at the Site, nor has a remedial-action plan been per-

---

[22] MCL 324.20101(1)(m) (emphasis added).

formed. Thus, Waterous, as the responsible party, was required to perform a full investigation to determine the nature, extent, and impact of the contamination. To hold otherwise would shift the burden of such a determination to the DEQ, thus rendering moot the responsibility placed on the liable party by part 201. Therefore, the trial court properly ordered Waterous to perform the response activities required by part 201 to investigate and remedy contamination in the soils, groundwater, and river sediments of the facility.

### E. OTHER PARTIES' LIABILITY

Waterous argues that the trial court impermissibly held it liable for cleanup that was the legal responsibility of other parties, including upstream polluters, and the purchaser/developer who redeveloped the site from industrial use to commercial/residential use. We disagree.

MCL 324.20107a(1) imposes certain "due care" obligations on the current owner of contaminated property:

> A person who owns or operates property that he or she has knowledge is a facility shall do all of the following with respect to hazardous substances at the facility:
>
> (a) Undertake measures as are necessary to prevent exacerbation of the existing contamination.
>
> (b) Exercise due care by undertaking response activity necessary to mitigate unacceptable exposure to hazardous substances, mitigate fire and explosion hazards due to hazardous substances, and allow for the intended use of the facility in a manner that protects the public health and safety.
>
> (c) Take reasonable precautions against the reasonably foreseeable acts or omissions of a third party and the consequences that foreseeably could result from those acts or omissions.

As the DEQ explains, the purpose of MCL 324.20107a is to place certain obligations on the current owner of a

facility to prevent unnecessary human exposure to hazardous substances, prevent disruption of limited response activities that have already been performed, and ensure that work being performed at the facility does not result in new releases of contamination.

Under MCL 324.20126a, once a party is found liable under the NREPA, it is jointly and severally liable for all response activities at the facility.[23] By referring to the current owner's obligations under MCL 324.20107a, Waterous is erroneously attempting to obscure its own liability and circumvent the act's intent that the primary responsibility for remediation is on the party liable for the contamination—which is indicated by the language in MCL 324.20102:

The legislature hereby finds and declares:

* * *

(f) That liability for response activities to address environmental contamination should be imposed upon those persons who are responsible for the environmental contamination.

---

[23] MCL 324.20126a states:

(1) Except as provided in [MCL 324.20126(2)], a person who is liable under [MCL 324.20126] is jointly and severally liable for all of the following:

(a) All costs of response activity lawfully incurred by the state relating to the selection and implementation of response activity under this part.

(b) Any other necessary costs of response activity incurred by any other person consistent with rules relating to the selection and implementation of response activity promulgated under this part.

(c) Damages for the full value of injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction, or loss resulting from the release.

(g) That to the extent possible, consistent with require-
ments under this part and rules promulgated under this
part, response activities shall be undertaken by persons
liable under this part.

The fact that a current owner *may* be liable for
violating its due-care responsibilities by exacerbating
or causing the additional release of the existing
contamination does not by itself relieve the primarily
responsible party of its obligations. If Waterous be-
lieves the developer has indeed violated its due-care
obligations, its proper remedy is to seek redress
under MCL 324.20107a.[24] However, on this point, the
DEQ notes that the developer submitted and followed a
due-care plan, which was overseen by the DEQ, when it
performed its work at the Site, including moving soil to
create the new riverbank.

Turning to the issue of other potential contributors
to the contamination, the NREPA provides that Water-
ous, as the prima facie liable party, bore the burden of
showing that it was not actually liable for the contami-
nation at issue.[25] As stated, failing that burden renders

---

[24] MCL 324.20107a(2) provides:

Notwithstanding any other provision of this part, a person who
violates subsection (1) is liable for response activity costs and
natural resource damages attributable to any exacerbation of
existing contamination and any fines or penalties imposed under
this part resulting from the violation of subsection (1) but is not
liable for performance of additional response activities unless the
person is otherwise liable under this part for performance of
additional response activities. The burden of proof in a dispute as
to what constitutes exacerbation shall be borne by the party
seeking relief.

[25] MCL 324.20126(6) provides:

In establishing liability under this section, the department
bears the burden of proof. If the department proves a prima facie

a liable party jointly and severally liable.[26] Therefore, by referring to other potential contributors' obligations for the contamination, Waterous is again erroneously attempting to obscure its own liability and circumvent the act's intent that Waterous fulfill its responsibility for remediation of the contamination. If Waterous believes other potential contributors are responsible, its proper remedy is to seek redress under MCL 324.20129.[27]

Accordingly, we conclude that the trial court did not err in finding that Waterous was the liable party under the NREPA and that, therefore, Waterous is obligated to perform the requisite remediation at the Site.

---

case against a person, the person shall bear the burden of showing by a preponderance of the evidence that he or she is not liable under this section.

[26] MCL 324.20126a(1).

[27] MCL 324.20129(3) states:

A person may seek contribution from any other person who is liable under [MCL 324.20126] during or following a civil action brought under this part. This subsection does not diminish the right of a person to bring an action for contribution in the absence of a civil action by the state under this part. In a contribution action brought under this part, the court shall consider all of the following factors in allocating response activity costs and damages among liable persons:

(a) Each person's relative degree of responsibility in causing the release or threat of release.

(b) The principles of equity pertaining to contribution.

(c) The degree of involvement of and care exercised by the person with regard to the hazardous substance.

(d) The degree of cooperation by the person with federal, state, or local officials to prevent, minimize, respond to, or remedy the release or threat of release.

(e) Whether equity requires that the liability of some of the persons should constitute a single share.

F. CORPORATE-SUCCESSOR LIABILITY

Waterous argues that the trial court erred in imposing corporate-successor liability on it when it did not contractually assume environmental liabilities for the Site and when nothing in the NREPA requires it to bear successor liability. We disagree.

According to the DEQ's December 2002 notice letter to Waterous:

> Persons who are liable for the [Site] pursuant to [MCL 324.20126] of the NREPA include persons who arranged for a hazardous substance to be transported to, disposed of, or treated at the [Site]; and persons who selected the [Site] and transported a hazardous substance to the [Site]. Other persons who are liable for the [Site] include owners and operators of the [Site] who were responsible for an activity causing a release or threat of release of a hazardous substance at the [Site] and owners and operators who owned or operated the [Site] on or after June 5, 1995, who did not comply with the requirements of [MCL 324.20126(1)(c)(*i*) and (*ii*)] for performing or disclosing the results of a Baseline Environmental Assessment.

The letter went on to cite the "Plan and Agreement of Merger" (Merger Agreement) entered when TCIW merged with Waterous in February 1978. Specifically, the Merger Agreement states as follows:

> On the Effective Date of the Merger, [TCIW] shall be merged into WATEROUS which shall be the Surviving Corporation and WATEROUS on such date shall merge [TCIW] into itself. The corporate existence of WATEROUS with all its purposes, powers and objects, shall continue unaffected and unimpaired by the merger, and as the Surviving Corporation it shall be governed by the laws of the State of Minnesota and shall succeed to all rights, assets, liabilities and obligations of [TCIW] in accordance with the Michigan Business Corporation Act.

The separate existence and corporate organization of [TCIW] shall cease upon the Effective Date of the Merger and thereupon [TCIW] and WATEROUS shall be a single corporation, to wit, WATEROUS.

On the basis of the foregoing, the trial court concluded that, even though Waterous never owned the Site while any release of contamination took place, Waterous was indeed liable for the discharge because, as TCIW's successor in interest, Waterous stood in TCIW's shoes for the purposes of liability. The trial court based this decision on the Merger Agreement between TCIW and Waterous and the Michigan Business Corporation Act,[28] which both state that a surviving corporation, here Waterous, assumes all the liabilities of each of the other corporate parties to the merger.

Nevertheless, Waterous argues that it did not agree to assume the environmental liability at issue, pointing to article 4.1(g) of the Plan of Reorganization and Agreement of Merger, which states:

4.1 [TCIW] represents and warrants to WATEROUS . . . as follows:

\* \* \*

(g) There are no liabilities of [TCIW] of any kind whatsoever, whether or not accrued and whether or not determined or determinable, in respect of which WATEROUS . . . may

---

[28] MCL 450.1724(1)(d) states:

When a merger takes effect, all of the following apply:

\* \* \*

(d) The surviving corporation has all liabilities of each corporation party to the merger.

become liable on or after consummation of the merger contemplated by this Agreement other than

(i) liabilities disclosed or provided for in the balance sheets of [TCIW] as of December 31, 1976, and as of November 30, 1977, referred to in Section 4.1(f) above, including the notes to said balance sheets;

(ii) liabilities incurred since December 31, 1976 in the ordinary course of business, all of which are reflected on the books and records of [TCIW] and none of which are materially adverse to the business, assets or results of operations of [TCIW.]

The trial court acknowledged that article 4.1(g) of the Plan of Reorganization and Agreement of Merger indicated that Waterous was not intended to be liable for any obligations not stated in TCIW's balance sheets at the time of merger, but nevertheless concluded Waterous was responsible for the environmental liabilities by operation of law.

We conclude that the trial court correctly determined that, given the merger provision of the Merger Agreement, which specifically incorporated the terms of the Michigan Business Corporation Act, Waterous, as TCIW's successor in interest, stood in TCIW's shoes for the purposes of liability. To the extent this determination contravenes the warranty provision of article 4.1(g) of the Plan of Reorganization and Agreement of Merger, Waterous's proper remedy would be a breach of warranty action against TCIW.

Additionally, the trial court found it significant that Waterous failed to comply with MCL 324.20126(1)(c), which allows certain innocent purchasers to avoid liability. The trial court therefore correctly refused to allow Waterous to create its own innocent-purchaser exception not provided by statute.

In sum, we conclude that the trial court did not err in imposing corporate-successor liability on Waterous.

### III. EXPERT TESTIMONY

#### A. STANDARD OF REVIEW

Waterous argues that the trial court erred by ordering investigation and possible remediation of sediments based on unpromulgated guidelines and by admitting the DEQ's expert's testimony on sediments that was based on nonbinding agency guidelines and not based on reliable principles and methods.

This Court reviews for an abuse of discretion a trial court's decision to admit or exclude evidence.[29] An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes.[30]

#### B. RELIABILITY OF DATA

MRE 702 governs the admission of expert testimony and provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[29] *Barrett v Kirtland Community College*, 245 Mich App 306, 325; 628 NW2d 63 (2001).

[30] *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006).

The admission of expert testimony requires that (1) the witness be an expert, (2) there are facts in evidence that require or are subject to examination and analysis by a competent expert, and (3) the knowledge is in a particular area that belongs more to an expert than to the common man.[31] The party presenting the expert bears the burden of persuading the trial court that the expert has the necessary qualifications and specialized knowledge that will aid the fact-finder in understanding the evidence or determining a fact in issue.[32] A witness may be qualified as an expert by knowledge, skill, experience, training, or education.[33]

Waterous does not challenge the expert's testimony on the basis of his qualifications, but instead challenges the data on which he based his opinion. At trial, the DEQ's expert relied on two exhibits—unpromulgated quality-screening guidelines and a draft memorandum—in support of establishing the criteria against which the presence of certain contaminants should be measured to determine whether remediation is necessary. Waterous's counsel objected to the expert's testimony, arguing that his opinions were not based on reliable methods because the screening levels were inherently unreliable. The DEQ's counsel responded as follows:

> The witness's testimony has made clear that those guidelines which are themselves derived from a variety of actual site-specific studies at various locations were collected, were developed using reliable methods, and the witness's testimony . . . relied upon those values as just one

---

[31] *King v Taylor Chrysler-Plymouth, Inc*, 184 Mich App 204, 215; 457 NW2d 42 (1990).

[32] *Davis v Link, Inc*, 195 Mich App 70, 74; 489 NW2d 103 (1992).

[33] MRE 702; *Mulholland v DEC Int'l Corp*, 432 Mich 395, 403; 443 NW2d 340 (1989).

piece of information that he used in evaluating the potential environmental significance of the data at his site.

At the end of the day, the witness's testimony depends upon recognized scientific techniques involving collection of samples from sediments, comparing them to published screening values. Those values themselves are related to and depend upon aquatic toxicity testing that formed the basis of those at various sites.

The trial court then denied Waterous's motion to strike the testimony, stating:

Well, it seems to me that there is no challenge here to the underlying collection process or methods for obtaining the data that the witness relied on. There is no challenge to those. There is no claim that that is unreliable or was done with an improper methodology. It's, rather, the guidance or the factors that the witness relied upon in part in reaching his conclusion.

It also seems to me that part of the relief that MDEQ is asking for is that there be a remedial investigation done to determine the extent of potential impact or harm on the environment, and in a way [Waterous] is almost requiring MDEQ to prove that aspect when in fact it's part of the relief that they're asking for. So the fact that we only have a guidance or a set of factors that are used as guidance to illustrate potential impact or damage to the environment is not deadly to this witness's ability to form an opinion as to the need for remedial investigation and remedial action.

* * *

I think it's been demonstrated that this witness had reliable scientific opinion testimony to offer the Court that will assist the trier of fact in making an ultimate conclusion in this case, and the motion to strike his testimony is denied.

Given the trial court's explanation, we conclude that the trial court did not abuse its discretion in admitting

the evidence and the witness testimony based thereon. As the trial court stated, the point of this case was to show that remedial action was warranted, not to absolutely prove the extent of contamination.

## IV. STATUTE OF LIMITATIONS FOR PUBLIC-NUISANCE CLAIM

### A. STANDARD OF REVIEW

Waterous argues that the trial court erred in denying Waterous's motion for partial summary disposition of the DEQ's claim for public nuisance based on the applicable statute of limitations. Absent disputed issues of fact, this Court reviews de novo whether the cause of action is barred by a statute of limitations.[34]

### B. CONTINUING TORT

Initially, we note that Waterous has conceded that because the DEQ sought injunctive relief, the period of limitations for its nuisance claim was six years.[35] Nevertheless, Waterous argues that the trial court incorrectly relied on a nonbinding, unpublished case to hold that, because the alleged nuisance was continuing, the DEQ's claim was not barred by the statute of limitations. Moreover, Waterous argues that the unpublished case is distinguishable from the present case because in that case, and the cases relied on therein, the tortious acts were ongoing, as opposed to being merely the harmful effects of completed conduct, as in the present case.

Pursuant to court rule, an unpublished opinion has no precedential value.[36] However, when a party chooses

---

[34] *Colbert v Conybeare Law Office*, 239 Mich App 608, 613-614; 609 NW2d 208 (2000).

[35] MCL 600.5813.

[36] MCR 7.215(C)(1); *Charles Reinhart Co v Winiemko*, 444 Mich 579, 588 n 19; 513 NW2d 773 (1994).

to cite an unpublished opinion, this Court may follow that decision if it finds the reasoning persuasive.[37] The case relied on by the trial court, *Bielat v South Macomb Disposal Auth, supra*, is persuasive given the similarity between the arguments addressed there and in this case.

In *Bielat*, similar to the parties' argument in this case, the plaintiffs argued that their nuisance claim was not time-barred because they suffered damage as a result of a continuing and repeated tort—"the migration of contaminated water and leachate from the landfills onto plaintiffs' property and into their groundwater."[38] The defendants countered that the doctrine of continuing wrongful acts did not apply because the plaintiffs' claims were not based on recurring wrongful conduct, but rather stemmed from the recurring harmful effects of a completed act.

In addressing the parties' arguments, the *Bielat* panel quoted the following passage from *Blazer Foods, Inc v Restaurant Properties, Inc*:[39]

> "Under the continuing wrong doctrine, 'an alleged timely actionable event will allow consideration of and damages for connected conduct that would be otherwise barred.' Thus, in certain cases, the doctrine recognizes that ' "[w]here a defendant's wrongful acts are of a continuing nature, the period of limitation will not run until the wrong is abated; therefore, a separate cause of action can accrue each day that the defendant's tortious conduct continues." ' " [Internal citations omitted.][40]

Further citing *Blazer Foods*, the *Bielat* panel stated:

---

[37] *Plymouth Stamping v Lipshu*, 168 Mich App 21, 27-32; 424 NW2d 530 (1988), aff'd 436 Mich 1 (1990).

[38] *Bielat, supra* at 4.

[39] *Blazer Foods, Inc v Restaurant Properties, Inc*, 259 Mich App 241, 246; 673 NW2d 805 (2003).

[40] *Bielat, supra* at 6.

To recover under the theory of continuing wrong, the plaintiff must establish that continual tortious acts constitute a continuing wrong. Continual harmful effects from an original completed act do not constitute a continuing wrong. The doctrine is applied in limited circumstances: trespass, civil rights claims and nuisance.[41]

The trial court in *Bielat* attempted to rely on *Jackson Co Hog Producers v Consumers Power Co*,[42] to support its holding that the continuing-wrongful-acts doctrine did not apply on the basis of its conclusion that the plaintiffs were really arguing the continued harmful effects of the alleged tortious acts. However, the *Bielat* panel pointed out that *Jackson Co Hog Producers* was distinguishable because it ultimately involved only negligence claims.

Turning its attention to several cases that specifically addressed the continuing-wrong doctrine in the context of trespass and nuisance claims, the *Bielat* panel found most persuasive this Court's decision in *Traver Lakes Community Maintenance Ass'n v Douglas Co*.[43] In that case, this Court noted that claims for a continuing trespass or nuisance occurring within the limitations period are not barred and stated that damages recoverable under such claims generally depend "upon whether the interference with the plaintiff's property is permanent or temporary."[44] Where a nuisance is temporary, that is, one that is abatable by reasonable curative or remedial action, damage to property affected by the nuisance is recurrent and monetary damages may be recovered from time to time until the nuisance is abated.[45]

---

[41] *Id.*, citing *Blazer Foods, supra* at 246-247.

[42] *Jackson Co Hog Producers v Consumers Power Co*, 234 Mich App 72, 81; 592 NW2d 112 (1999).

[43] *Traver Lakes Community Maintenance Ass'n v Douglas Co*, 224 Mich App 335, 341; 568 NW2d 847 (1997).

[44] *Id.* at 347.

[45] *Id.* at 347-348.

Part 201 of the NREPA was designed to address temporary nuisances, like the claims herein.[46] Therefore, damage to the Site caused by the nuisance is recurrent and monetary damages may be recovered from time to time until the nuisance is abated. Accordingly, we conclude that the trial court did not err in denying Waterous's motion for partial summary disposition on the ground that the DEQ's claim was not time-barred.

### V. FAILURE TO NOTIFY

### A. STANDARD OF REVIEW

Waterous argues that the trial court erred in denying Waterous's motion for summary disposition because the DEQ violated its administrative rules when it failed to notify Waterous that it was a liable party until after the public SRP Grant had been spent at the site, cleanup work was completed, and evidence was destroyed and because the DEQ knew that Waterous was a potentially liable party before the SRP Grant was approved and cleanup commenced.

Under MCR 2.116(C)(10), a party may move for summary disposition of a claim on the ground that there is no genuine issue with respect to any material fact and that the moving party is entitled to judgment as a matter of law. The moving party must specifically identify the undisputed factual issues and support its position with documentary evidence.[47] The trial court must consider all the documentary evidence in the light most favorable to the nonmoving party.[48] This Court

---

[46] MCL 324.20102.

[47] MCR 2.116(G)(3)(b); *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).

[48] MCR 2.116(G)(4); *Maiden, supra* at 120.

reviews de novo the trial court's ruling on a motion for summary disposition.[49]

### B. DEQ ADMINISTRATIVE RULE 299.5115

DEQ Administrative Rule 299.5115 provides, in pertinent part:

> (1) Except as provided in subrule (3) of this rule, before beginning response activity at a facility with public funds, the department shall provide notice to persons who are liable who have been identified, as described in this rule.

> \* \* \*

> (3) The requirements of this rule shall not apply when the department has not determined that a person is liable or when the notice process would unreasonably delay the response. [Mich Admin Code, R 299.5115.]

The language of the rule is clear: the DEQ has no obligation to notify a party until the department determines that an identifiable party is liable. Therefore, the plain language of the rule negates Waterous's argument that the DEQ had a duty to notify it as a *potentially* liable party. Moreover, because Waterous settled the claims for past costs before trial, this issue is moot.

Additionally, there is no merit to Waterous's spoliation-of-evidence claim. As the trial court concluded in ruling on Waterous's motion in limine to exclude evidence of the Site's former environmental condition because of the state's spoliation of evidence, there is no evidence that the DEQ engaged in any misconduct here.[50]

---

[49] *Tillman v Great Lakes Truck Ctr, Inc*, 277 Mich App 47, 48; 742 NW2d 622 (2007).

[50] See *Brenner v Kolk*, 226 Mich App 149, 160; 573 NW2d 65 (1997).

Accordingly, we conclude that the trial court did not err in denying Waterous's motion for summary disposition on its failure-to-notify claim or its motion regarding the spoliation of evidence.

Affirmed.